## UNITED STATES v. BADISCHE Co. et al. (No. 1301).[1]

COAL-TAR COLORS AND DYES—WHAT NOT.

The merchandise consists of preparations of coal tar known as bases. These bases, after acid treatment, are used in dyeing fabrics. The proof does not show there is a commercial designation of these goods as coal-tar colors and dyes, and as brought in they are not coal-tar colors and dyes, but a product or preparation of coal tar, not medicinal, and were dutiable as such under paragraph 15, tariff act of 1909.

### United States Court of Customs Appeals, April 14, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7505 (T. D. 33831).

[Affirmed.]

*William L. Wemple*, Assistant Attorney General (*Leland N. Wood*, special attorney, of counsel), for the United States.

*Walden & Webster* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

This case involves the classification for tariff purposes of certain coal-tar products, which were assessed for duty by the collector of customs at the port of New York as coal-tar colors at 30 per cent ad valorem under that part of paragraph 15 of the tariff act of 1909 which reads as follows:

15. Coal-tar dyes or colors, not specially provided for in this section, thirty per centum ad valorem; * * *.

The importers protested that the goods were not coal-tar dyes or colors, but nonmedicinal preparations of coal tar not specially provided for and dutiable at 20 per cent ad valorem under that part of said paragraph 15 which reads as follows:

15. * * * All other products or preparations of coal tar, not colors or dyes and not medicinal, not specially provided for in this section, twenty per centum ad valorem.

---

[1] Reported in T. D. 34400 (26 Treas. Dec., 676).

The Board of General Appraisers sustained the protest and the Government appealed.

It appears from the record that the several articles which were subjected to duty by the collector as coal-tar colors are known as Victoria blue B base, Victoria green base, auramine base, crystal violet base, vesuvin B base, vesuvin 000 extra base, methyl violet base, rhodamine base, and chrysoidine base. The uncontradicted testimony of the importers discloses that these commodities are used for the manufacture of the colors indicated by their names and that they are denominated bases for the reason that they must be first chemically combined with an acid in order to produce a dye or coloring material. The designation of the bases as blue, green, violet, or brown does not at all indicate that they are of the color designated or that they are capable of imparting it, but that the base will produce the designated color when submitted to appropriate treatment and processing. The evidence is undisputed that the substances in controversy of themselves have no tinctorial properties and that until the bases are converted into salts by chemically combining them with some suitable acid none of them can be used as a dye or color. In order that any of the coal-tar color bases in question may be given the character of a color and made effective as a coloring agent it must be first converted into a salt by chemically combining it with oleic or some other organic acid adapted to the purpose That means, of course, the creation of a chemical compound, a new article, endowed with properties distinctly different from those possessed by either base or acid prior to their chemical union. From all this it is apparent that the color bases involved in the protests under consideration are not themselves dyes or colors, as those terms are commonly understood, but substances from which such colors and dyes are made. In other words, that which may be properly called a color is the salt and not the coal-tar base from which the salt was produced.

The appellant contends, however, that the expression "coal-tar dyes or colors" is a tariff designation to which the trade of the country has given a meaning different from that popularly assigned to it and broad enough to cover the goods in question. In support of this contention the Government on the hearing before the board produced the testimony of several witnesses, who testified in effect that they were engaged in the business of buying and selling at wholesale coal-tar bases and that merchandise of that character was included by the trade in the category of coal-tar dyes or colors. These same witnesses made it clear, however, that the several articles imported were ordered, bought, and sold under their distinctive names, and we are decidedly at a loss to understand just how wholesale dealers managed to give to the expression "coal-tar dyes or colors" a meaning differ-

ent from its common signification and just how those who testified on the subject acquired the knowledge that such a meaning had been conferred. Possibly there were usages of the trade other than the ordering, buying, and selling of goods which enlarged the signification of the term "coal-tar dyes or colors" so as to include materials for the manufacture of colors and dyes, but if so no such usages were pointed out by any of the witnesses. The evidence of the Government as to commercial meaning was confined to the bare assertion that trade and commerce included within the tariff designation under discussion merchandise which would be excluded by the common meaning of such designation. Such evidence is but little better than the statement of a mere conclusion, and is not very convincing unsupported by any fact which would justify it or by any proof whatever that the designation was actually used in the trade. Moreover, some of the witnesses were unable to give any information as to what signification was attached by the trade to "coal-tar dyes or colors," and those who did attempt to define it were not entirely in accord. One of the witnesses, Paul R. McKinney, testified that the meaning of the designation in the trade did not differ from its common everyday meaning. He also said that the designation was broadening all the time in the trade, from which it would seem that the trade understanding was not definite, and therefore lacking in one of the essentials necessary to constitute commercial designation.

Eugene A. Widmann stated that in the trade "coal-tar dyes or colors" meant coloring matters "soluble, primarily, in water or alcohol or oils, in acids.".

W. J. Robertson said that, commercially speaking, coal-tar dyes or colors were dyes, from which it would appear that in the trade colors and dyes meant the same thing, and were consequently synonymous terms.

Ernest C. Klipstein declared, on the other hand, that a dye, as understood by the trade, was a coloring matter soluble in water, and that a color was a coloring matter not soluble in water.

Now, strictly speaking, that which is soluble is that which is capable of being reduced to a liquid state by the disintegrating action of a fluid without chemical change or reaction. See "Solution" (Century Dictionary). It may be properly said of salt and sugar that they are soluble in water, inasmuch as neither salt nor sugar apparently suffers any chemical change by being so dissolved, and both may be recovered by evaporating the water which seemingly holds them in suspension. The same may not be said of other solids, however, which by the chemical action of an acid produce a liquid from which neither of the materials out of which it was made can be secured by purely mechanical processes.

According to the clear preponderance of evidence in this case, the coal-tar bases here involved, when subjected to the action of the organic acid which made them commercially useful, underwent a chemical change which created out of oil and base a new chemical body endowed with coloring properties possessed by neither of the raw materials. The bases were therefore not held in solution and were therefore not within the trade meaning of "coal-tar dyes or colors" as defined by Widmann and Klipstein, giving to the word "soluble" its true meaning. Possibly both witnesses used the term "soluble" without much thought of its real signification, but if so, we are left to surmise what they really meant, and that does not make their definition any more acceptable. Taking into consideration all the evidence brought forward by the Government, we can not say that the board was not warranted in finding that there was a failure to prove that the tariff designation in issue had a definite, uniform, and general trade signification different from that which it commonly bore.

We are of opinion, therefore, that the decision of the Board of General Appraisers was correct, and, accordingly, it is *affirmed.*